UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Deborah A. Foster, | ) | |
| | ) | C/A No.: 4:13-cv-2502-DCN-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN,[1] ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits (DIB) and Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

On September 8, 2009, the Plaintiff filed an application for DIB. She also protectively filed an application for SSI on August 4, 2009. She alleges disability beginning July 9, 2009. The claim was denied initially and upon reconsideration. (Tr. 13). A hearing was held by an administrative law judge ("ALJ") on February 27, 2012. The ALJ found in a decision dated May 25, 2012, that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review. Plaintiff filed

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

this action on September 13, 2013, in the United States District Court for the District of South Carolina.

## II.  INTRODUCTORY FACTS

Plaintiff was born on September 25, 1964 and was forty-seven years old at the time of the ALJ's decision.  (Tr. 33, 173).  She completed the eleventh grade, and has past relevant work as a shipping/receiving clerk, waitress, molding machine operator, and cook/assistant manager.  (Tr. 36, 63-65).  She claims disability beginning July 9, 2009 due to congestive heart failure, hypertension, shortness of breath, pain in the hands, knees, chest, and back, hepatitis C, acid reflux and anxiety. (Tr. 84).

## III.  THE ALJ'S DECISION

In the decision of May 25, 2012, the ALJ found the following:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2.    The claimant has not engaged in substantial gainful activity since July 9, 2009, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: coronary artery disease, congestive heart failure, hypertension, chronic obstructive pulmonary disease, and degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or  medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).

2

Specifically, the claimant could lift and carry up to twenty pounds occasionally and ten pounds frequently. In addition, the claimant could only occasionally stoop, crouch, kneel, crawl, and occasionally climb stairs or ramps. The claimant cannot climb ladders, ropes or scaffolds. The claimant should avoid concentrated exposure to dusts, fumes, gases and odors. The claimant should avoid concentrated exposure to extreme temperature or humidity, The claimant should avoid dangerous machinery with exposed moving parts because of her medication, Plavix.

6.     The claimant is capable of performing past relevant work as a waitress. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from July 9, 2009, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 13-21).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that it is free from harmful legal error. Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the court disagrees, so long

as it is supported by substantial evidence.  42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established.  Five questions are to be asked sequentially during the course of a disability determination.  20 C.F.R. §§ 404.1520, 1520a (1988).  An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. § 404.1503(a).  Hall v. Harris, 658 F.2d 260 (4th Cir. 1981).  An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied.  Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if she can return to her past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.

4

SSR 82-62.  The claimant bears the burden of establishing her inability to work within the meaning of the Social Security Act.  42 U.S.C. § 423(d)(5).  She must make a prima facie showing of disability by showing she is unable to return to her past relevant work.  Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  Id. at 191.

## IV. ARGUMENTS

The Plaintiff argues that the ALJ erred in his decision.  Specifically, Plaintiff raises the following arguments in her brief, quoted verbatim:

I.     The ALJ failed to evaluate the combined effect of Ms. Foster's multiple impairments; and

II.    The ALJ's RFC findings are not supported by substantial evidence nor based on the appropriate legal framework.

(Plaintiff's brief).

Defendant argues that the decision in this case is sufficient to show that the ALJ reasonably considered the combined effects of Plaintiff's impairments and that the ALJ properly evaluated the medical evidence.

<u>**V. MEDICAL RECORDS AND OPINIONS**</u>[2]

Plaintiff filed applications claiming disability as of July, 2009. She alleged that she was unable to work due to chronic obstructive pulmonary disease, coronary artery disease, congestive heart failure, and degenerative disc disease. She reported anxiety and depression. Prior to her onset and by way of background, Plaintiff had been hospitalized for an accidental tricyclic antidepressant overdose (Tr. 283-284). She had been prescribed Valium and Xanax, which she had taken too much of in response to work-related stress from her job at Wal-Mart. While she was hospitalized for several days, physicians concluded that the overdose of anti-depressant medication occurred in the context of intoxication with her anti-anxiety medications. Diagnoses then included Benzodiazepine dependence/withdrawal, depressive disorder, cluster B traits, a history of congestive heart failure, GERD, vertigo, and work-related stress.

Cardiologist Dr. Himaxi Maisuria began following Plaintiff in 2008 (Tr. 453-467). In July 2008, Plaintiff began to report chest pain and shortness of breath. Dr. Maisuria counseled her to stop smoking. He noted her past medical history which included respiratory problems.

Plaintiff presented to the Sisters of Providence Hospital on July 1, 2008 after undergoing elective cardiac catheterization at the South Carolina Heart Center the same day (Tr. 299-301). She underwent two-vessel coronary artery bypass grafting on July 3, 2008. She did well postoperatively, though she did develop some desaturation and wheezing and was placed on oxygen and discharged with home oxygen and medication. She was discharged on July 8, 2008. She was readmitted to the hospital on July 10, 2008 and received a blood transfusion after it was found that she was anemic

---

[2]The Commissioner indicates that it does "not take issue generally with Plaintiff's summary of her medical history," with the addition of certain facts included in its brief.

(Tr. 353-354).

Plaintiff saw Dr. William Allen of Thoracic and Cardiovascular Associates on July 15, 2008 and noted that she was "convalescing favorably, albeit slowly" (Tr. 321). Her wound was healing well and Dr. Allen removed some staples and gave her a prescription for Darvocet. Plaintiff called Dr. Allen's office on July 18, 2008 stating that she was experiencing incisional pain and sharp pain around the collarbone (Tr. 320). She felt it was related to her increasing activity. She requested a refill of Darvocet. Dr. Allen declined to refill this and she was directed to alternate the Darvocet with Ibuprofen and try a heating pad. By July 30, 2008, Dr. Allen noted that Plaintiff was "doing well," however, she still complained of continuing chest pain (Tr. 318-319).

Following her procedure, Plaintiff was referred for cardiac rehabilitation (Tr. 325-329). She was seen in the emergency room on September 12, 2008 with complaints of chest pain since her surgery (Tr. 374-384). A chest CT showed cardiomegaly and pulmonary parenchymal evidence of interstitial edema consistent with left ventricular failure. Diagnoses on discharge included chest pain and congestive heart failure.

Dr. Maisuria cleared Plaintiff to return to work on September 24, 2008 (Tr. 459).

Plaintiff underwent an endoscopy and biopsies in October 2008 due to esophageal dysphagia. Exam showed possible gastroparesis (Tr. 333). She also presented to the hospital again that month with generalized pain (Tr. 386-396).

Dr. John Motto managed Plaintiff's pain medications in 2009 and throughout the relevant period. She received narcotic pain medication prescriptions for right arm pain, osteoarthritis, and chest pain (Tr. 337-341).

Dr. Maisuria saw Plaintiff in follow-up on April 2, 2009 (Tr. 454-456). While she was stable

7

from a cardiac standpoint, Dr. Maisuria limited her from "heavy lifting or pulling" and recommended she only do "light duty".

On April 30, 2009, Plaintiff told Dr. Motto that she had moved in with her father. She had lost 30 pounds, and did well on recent stress and treadmill testing. She reported that she had good and bad days. Her last good day was three days before. She complained of persistent pain in the anterior chest and both shoulders (Tr. 334-335). Dr. Motto continued to manage her medications (Tr. 345-351).

On June 2, 2009, Plaintiff went to Lexington Medical Center with neck pain (Tr. 399- 406). An x-ray of the cervical spine showed mild degenerative changes, most prominent at C5-6 (Tr. 407). Impression was neck strain, and she was prescribed Advil and advised to use heat.

After her alleged onset date, Plaintiff presented to the ER again on August 18, 2009 with complaints of generalized body ache (Tr. 412-417). She was diagnosed with bronchitis, and a chest CT revealed probably pneumonia in the left lung. (Tr. 426). Plaintiff was seen again for a chronic cough and bronchitis on November 8, 2009 (Tr. 428-437). An EKG on November 19, 2009 showed an ejection fraction of 60 to 65 percent, but stress testing indicated no ischemia (Tr. 442-444).

Plaintiff followed-up with Dr. Maisuria on December 2, 2009 (Tr. 451-453).

On January 30, 2010, Plaintiff presented to Palmetto Baptist Hospital with shortness of breath, cough, and wheezing. She was treated for bronchitis, COPD exacerbation and possible pneumonia (Tr. 473-476). A chest x-ray showed interstitial infiltrates of indeterminate activity (Tr. 477). It was noted that there was no evidence of congestive heart failure or other underlying cardiac event (Tr. 475).

Plaintiff was admitted again for similar symptoms from February 3 to February 8, 2010 (Tr. 486-496). Diagnoses included community-acquired pneumonia with failed outpatient therapy, questionable narcotic withdrawal, and previous CHF. X-rays showed chronic changes with some streaky infiltrates in the right middle lobe suspicious for pneumonia (Tr. 497). There was also some evidence of pulmonary edema. During her stay, she was very anxious and treated with Xanax at one point, but not started on it "chronically again."

Spirometry on February 11, 2010 revealed mildly reduced FEV and FEV-1 with no evidence for obstruction consistent with mild restrictive disease, though Plaintiff had used her albuterol inhaler prior to testing (Tr. 508-509). There was no improvement post-bronchodilator.

Plaintiff was hospitalized again for pneumonia on February 11 and discharged on February 14, 2010 (Tr. 525-526). Follow-up x-rays on March 15, 2010 indicated that this had resolved (Tr. 544, 610).

Plaintiff was seen at Lexington Medical Associates during this time for routine care and also reported hand pain (Tr. 545-558). She was recommended to use wrist splints for possible carpal tunnel syndrome.

In February 2010, Dr. Humphries, a state agency physician, reviewed Plaintiff's medical records and concluded that she should be able to do light work despite her impairments (Tr. 515-522). In doing so, Dr. Humphries noted that Plaintiff's gastroparesis and cervical arthritis would not cause additional limitations beyond those already attributable to her respiratory and cardiac impairments (Tr. 520).

While Plaintiff's medical history contains mentions of Hepatitis C, testing showed "very little if any active Hepatitis C" (Tr. 568).

9

Dr. Motto continued to dispense narcotic medication to Plaintiff for her complaints of pain (Tr. 576-585).

On August 22, 2010, Plaintiff presented to the Lexington Medical Center with left arm weakness (Tr. 590-592). Diagnosis was a possible peripheral nerve issue, though she admitted to taking some of her pain medication after burning herself. She followed up in October, 2010 with Dr. Carl White (Tr. 663). She had been wearing her splints. Dr. White referred her to an orthopedist for her possible CTS and continued her medications.

In September 2010, Dr. Michels, a state agency psychologist, concluded that Plaintiff had an anxiety-related disorder but that such condition was not medically severe, as it did not cause any significant limitations of her ability to do basic work functions (Tr. 647, 657, 659).

In November 2010, Dr. Weston, a state agency reviewing physician, concluded Plaintiff should be able to do medium work despite her impairments (Tr. 666-673).

In March 2011, Plaintiff told Dr. Maisuria that she had developed moderate chest pain a month previously; this pain was intermittent and episodes lasted around 5 minutes (Tr. 678). She had not had palpitations or syncope, claudication, stroke-like symptoms or any symptoms attributable to valvular heart disease (Tr. 678). Dr. Maisuria completed a questionnaire on April 7, 2011 (Tr. 676-677). He indicated that Plaintiff suffered from congestive heart failure and chronic chest pain related to prior surgery. He felt this pain would impair her ability to deal with normal work-related stress and affect her concentration such that she may have difficulty with multi-step processes. Most significantly, he indicated that she would need five or six breaks per workday of less than fifteen minutes each. He opined that she may have difficulty working a consistent eight hour day and that she might miss more than four days per month of work. Dr. Maisuria attached notes from an office

10

visit in support of his findings (Tr. 678-680). Dr. Maisuria noted on April 15, 2011 that the plan was to treat her pain medically and that Imdur (nitrates) had already helped her chest pain (Tr. 731-733).

During this time, Dr. Motto continued to monitor her pain medications (Tr. 681- 690, 741-755).

Dr. White noted on April 5, 2011 that Plaintiff had recently undergone a catheterization and reported that disease was found in three of her arteries which may require stent placement (Tr. 708). In June 2011, Dr. White indicated that he did not believe she had mental work limitations due to her pain (Tr. 700). He said that whether her pain would interfere with her ability to complete a work day or work week would depend on the type of work she was doing (Tr. 701).

In October 2011, Dr. Maisuria noted that both of Plaintiff's prior grafts remained patent, but she showed a moderate to severe lesion of the circumflex, which was suitable for continued medical management (Tr. 728). Plaintiff said her chest pain was unrelated to exertion and moderate in intensity, with no radiation. Id. Sometimes this was sharp and other times it was just a feeling of tightness Id. It was relieved in a few minutes with rest, and was not accompanied by shortness of breath Id.

## VI. THE HEARING

Plaintiff appeared before ALJ Frances Williams on February 27, 2012. (Tr. 29). Also present was Rielle Jabron, vocational expert (VE). At the time of the hearing, Plaintiff was 47 years old. She lived with her father, her adult daughter, and her granddaughter (Tr. 34). She used a ramp to get in and out of their home. She had a driver's license, but testified that she only drove three miles to the grocery store twice per week (Tr. 36).

Plaintiff had an eleventh grade education. She received no benefit or wage whatsoever, had

no insurance, and was not working nor volunteering at the time of the hearing (Tr. 37). Plaintiff had

not worked since her alleged onset date in July 2009 (Tr. 38).

Initially after her last job ended, Plaintiff had accepted unemployment benefits (Tr. 39). She

was looking for a cashier job, but was not really sure whether she could have kept a job had she had

the opportunity. She attributed this to her heart condition. Her most recent job had been in the

receiving department at Walmart. She stated that she unloaded pallets, moved boxes, received

shipments and that it was "very strenuous" (Tr. 40). Before her surgery, she estimated that she lifted

30 pounds and dragged pallets weighing as much as 1,000 pounds with a cart. After her surgery, she

estimated that she only lifted 15 pounds (Tr. 41). She walked or stood all day at that job. She was

not accommodated after her surgery officially, but her coworkers helped her.

Prior to the job at Walmart, Plaintiff had worked for eight months as a waitress (Tr. 43). She

described this as "typical waitress work" which included carrying plates, making salads, cleaning

and refilling condiments (Tr. 44). She had worked at the state fair, but only seasonally, as a cook and

"assistant manager" at a restaurant, operating a machine that molded plastic parts (Tr. 45-46).

Plaintiff suffered from heart problems which, she said, caused constant pain on her left side

(Tr. 47). Sometimes it was a "pressure pain" and other times it was a soreness (Tr. 48). A task as

small as taking something out of the refrigerator could exacerbate her pain. She also had pain down

the backs of her legs. Plaintiff experienced pain even at rest. She had good days and bad days. She

took nitroglycerine and Norco for her pain. The medication made her sleepy and sometimes

nauseated.

Plaintiff did laundry for herself and her father, but not every day (Tr. 51). She fed their

chickens when she could, but her daughter helped with chores like making beds. She shopped for

smaller items, but her daughter did the "big shopping" (Tr. 52). She usually made coffee and cooked a simple breakfast for herself and her father. She occasionally went to church. Overall, she described an inability to persist at things, which kept her from doing the things she wanted to do and enjoyed (Tr. 53).

The chest pain which Plaintiff experienced radiated to her arms (Tr. 54-55). This prevented her from picking things up. In addition, she had never gotten surgery for carpal tunnel syndrome, and she felt that this was the cause of the pain in her left arm. Her pain came and went. She had been over the counter braces for her wrists (Tr. 56-57). She had had pneumonia more than once (Tr. 61).

Plaintiff testified that she did very little to care for her father other than keep him company. She had a boyfriend who she went out to eat with sometimes (Tr. 58-59). After some confusion, the VE testified that Plaintiff's last work was classified as follows:

Shipping and receiving clerk – medium, unskilled work;

Waitress – light, semi-skilled;

Cook – medium, skilled; and

Molding machine operator – medium, unskilled (Tr. 64).

The VE testified that a worker limited to light work with restrictions on postural movements could only perform the waitressing work (Tr. 66). If the worker were restricted to sedentary work, she could do none of Plaintiff's past jobs, but could perform other representative occupations (Tr. 67-68). The VE further testified that Plaintiff had gained several transferable skills from her past work including operating a cash register, "keep up with production data" and ordering supplies. The VE felt that five to six rest periods throughout the day would not eliminate any jobs as long as the worker were "enthusiastic" (Tr. 71-72).

ALJ Williams found that Plaintiff had the following severe impairments: coronary artery disease, congestive heart failure, hypertension, chronic obstructive pulmonary disease, and degenerative disc disease of the lumbar spine. (Tr. 15). The following impairments were found to be non-severe: anxiety, depression, hyperlipidemia, sleep apnea, ulcerative colitis, pneumonia, headaches, and hepatitis B and C. ALJ Williams stated that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. ALJ Williams found that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically, the claimant could lift and carry up to twenty pounds occasionally and ten pounds frequently. In addition, the claimant could only occasionally stoop, crouch, kneel, crawl, and occasionally climb stairs or ramps. The claimant cannot climb ladders, ropes or scaffolds. The claimant should avoid concentrated exposure to dusts, fumes, gases and odors. The claimant should avoid concentrated exposure to extreme temperature or humidity, The claimant should avoid dangerous machinery with exposed moving parts because of her medication, Plavix. (Tr. 18). The ALJ found, based on the testimony of the vocational expert, that Plaintiff could perform her past relevant work as a waitress. (Tr. 20).

## VII. DISCUSSION AND ANALYSIS

One of the allegations by Plaintiff is that the ALJ failed to properly consider the opinion of Plaintiff's treating cardiologist Dr. Maisuria. Defendant argues that the ALJ properly considered Dr. Maisuria's opinion, and correctly found that it was not well-supported by objective clinical evidence.

The Social Security Administration's regulations provide that "[r]egardless of its source, we

14

will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than non-examining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).  Furthermore, 20 C.F.R. § 404.1527(c)(2) states: "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." SSR 96–2p requires that "the notice of the determination

or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Dr. Maisuria completed a questionnaire on April 7, 2011 (Tr. 676-677). He indicated that Plaintiff suffered from congestive heart failure and chronic chest pain related to prior surgery. He felt this pain would impair her ability to deal with normal work-related stress and affect her concentration such that she may have difficulty with multi-step processes. Most significantly, he indicated that she would need five or six breaks per workday of less than fifteen minutes each. He opined that she may have difficulty working a consistent eight hour day and that she might miss more than four days per month of work.

However, in his decision the ALJ only addressed a portion of this opinion. The ALJ noted that

> Dr. Maisuria suggested that the claimant would need to be away from her workstation for less than fifteen minutes, five to six times a day. However, I give little weight to Dr. Maisuria's opinion in that the vocational expert testified that such rest limitations would be acceptable with normal breaks.

However, in addition to this opinion, Dr. Maisuria also opined that Plaintiff would have difficulty working a full eight-hour day five days a week consistently due to chronic and/or cardiac pain. He also opined that Plaintiff may be expected to miss more than four days of work per month. Additionally, Dr. Maisuria indicated that the patient's chronic cardiac condition would interfere with her ability to remember and/or perform multi-step processes in a work environment, and would impair her ability to deal with normal work-related stress. The ALJ did not address these opinions. Accordingly, as they were not discussed, the ALJ also did give any indication of the weight being

16

given to these opinions. The RFC as proposed cannot be reconciled with this opinion by a treating physician.   The undersigned is constrained to recommend remand as it is not possible to determine if the ALJ's decision is supported by substantial evidence because the ALJ failed to fully consider the opinion of Dr. Maisuria, and failed to outline any reasons for accepting, rejecting or discounting the portions of the opinion which were not discussed.

As the undersigned recommends that this case be remanded for proper evaluation of her treating cardiologist's opinion,  the court does not consider Plaintiff's remaining allegations of error related to the alleged failure by the ALJ to consider Plaintiff's impairments in combination, and alleged failure to appropriately evaluation of her credibility at this time. Upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error.  It is possible that the ALJ's consideration of the issue discussed above and the opportunity to consider Plaintiff's position on the other issues raised herein may render Plaintiff's remaining allegations of error moot. See Boone v. Barnhart, 353 F.3d 203, 211 n. 19 (3d Cir.2003) (remanding on a particular ground and declining to address claimant's additional arguments).

## VIII.  CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case.  The Court cannot, however, properly review the decision on the record presented.

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631 (c) (3) of the Social Security Act, 42 U.S.C. Sections 405 (g) and 1338 (c) (3), it is, **RECOMMENDED** that the Commissioner's decision be **REVERSED** pursuant to

17

sentence four of 42 U.S.C. § 405(g) and that the case be **REMANDED** to the Commissioner for

further administrative action as set out above.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 14, 2015
Florence, South Carolina